*E-Filed 05/12/2010*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRISON VENTURES, LLC, a California Limited Liability Company; BULKLEY VENTURES, LLC, a California Limited Liability Company; and SAUSALITO ALTA MIRA, LLC, a Nevada Limited Liability Company,<br><br>    Plaintiffs,<br> v.<br><br>ALTA MIRA TREATMENT CENTER, LLC, a Delaware Limited Liability Company; DUAL DIAGNOSIS MANAGEMENT, L.L.C., a Tennessee Limited Liability Company, d/b/a FOUNDATIONS RECOVERY NETWORK; MICHAEL CARTWRIGHT; STERLING PARTNERS; STERLING VENTURE PARTNERS; ROB WAGGENER; and DOES 1-20, inclusive,<br><br>    Defendants.<br>_____/ | No. C 10-00188 RS<br><br>**ORDER GRANTING MOTION TO DISMISS** |

   This case arises from a landlord-tenant dispute over property located in Sausalito, California. Plaintiffs Harrison Ventures, LLC; Bulkley Ventures, LLC; and Sausalito Alta Mira, LLC (collectively, "Landlords") allege defendant Alta Mira Treatment Center, LLC ("AMTC") breached

1  its leases with Landlords.  They further allege that defendants Dual Diagnosis Management, L.L.C.

2  ("DDM"); Sterling Partners ("SP"); Sterling Venture Partners ("SVP");[1] and Rob Waggener

3  interfered with the leases and that defendant Michael Cartwright breached his guaranty of the leases.

4  AMTC, DDM, SP, SVP, and Waggener (collectively, "Tenants") have moved to dismiss Landlords'

5  First Amended Complaint ("FAC").  Cartwright joins in the Tenants' motion and further requests

6  dismissal of the breach of guaranty claim, which pertains only to him.  For the reasons stated herein,

7  the defendants' motion to dismiss is granted, with leave to amend in part.

I.   BACKGROUND

The FAC avers that Landlords own eight properties in the City of Sausalito.  Landlords contend that in June 2008 they entered into eight separate lease agreements with AMTC concerning these properties.  AMTC intended to take up occupancy for the purpose of running an inpatient drug and alcohol rehabilitation facility.  The FAC alleges that AMTC is a wholly-owned subsidiary of DDM, and that SP and SVP "provided substantial funds ($22 million) along with their expertise and business model to DDM and AMTC."  FAC at 3.

The eight lease agreements, which the parties agree are substantially identical, provide that Landlords will lease the eight properties to AMTC for a ten year term.  The combined rent was initially set at $200,000 per month, a sum that was set to increase annually by 3%.  The eight leases were personally guaranteed by defendant Cartwright, who at that time was the CEO of AMTC and DDM.

The leases contain, among other provisions, a paragraph entitled "Subordination, Attornment; Nondisturbance."  Lease Agreement at ¶ 28.[2]  The paragraph provides in pertinent part:

> Lessor shall obtain and furnish to Lessee a Nondisturbance Agreement from any current Beneficiary whose interest is superior to this Lease on or before the date this Lease is fully executed.  In the event Lessor has not furnished Lessee with an executed Nondisturbance Agreement from such Beneficiary within sixty (60) days from the date of this Lease, Lessee

---

[1] Defendants contend that Sterling Partners and Sterling Venture Partners were erroneously named in this action, and that plaintiffs intended to sue an entity called "Sterling DDM, Inc."

[2] The copy of the Lease Agreement attached to the FAC pertains only to the property located at 135 Bulkley Avenue.  The parties agree, however, that the other seven leases are identical except for the named property, and accordingly this lease may serve as an exemplar for all.

1   shall have the right to terminate this Lease and immediately receive from Lessor any and all prepaid rents, deposits, and other sums paid by Lessee on account of this Lease.
2
3   *Id.* The leases also provide:

4   Lessor Defaults. . . . [I]f default shall be made by Lessor in the performace or compliance with any of the covenants, agreements, terms, or conditions contained in this Lease, and such
5   default shall continue for a period of thirty (30) days after written notice thereof from Lessee to Lessor (provided, that if a default is curable and Lessor proceeds with due diligence
6   during such thirty (30) day period to cure such default and is unable by reason of the nature of the work involved to cure the same within the said thirty (30) days its time to do so shall
7   be extended for such additional period as shall be necessary to cure the same) . . . Lessee may, without notice, except as provided in this paragraph, elect to immediately terminate
8   this Lease at the option of the Lessee.

9   *Id.* ¶ 15. Finally, the leases provide:

10   Waiver of Breach.  No failure by Lessor or Lessee to insist upon the strict performance of any covenant, agreement, term, or condition of this Lease or to exercise any right or remedy
11   consequent upon a breach thereof shall constitute a waiver of any such breach or of such covenant, agreement, term, or condition.  No covenant, agreement, term, or condition of this
12   Lease to be performed or complied with by Lessor and Lessee, and no breach thereof, shall be waived, altered, or modified, except by a written instrument executed by the party to be
13   charged therewith.

14   *Id.* ¶ 17.

15   The leases were signed on June 1, 2008.  *Id.* at 1.  According to the FAC, in September 2008

16   the CFO of DDM inquired as to whether Landlords intended to comply with Paragraph 28 by

17   providing any relevant Nondisturbance Agreements; Landlords replied that their mortgage lenders'

18   office had closed and their lending officer had lost his job, so it was taking longer than anticipated to

19   acquire the necessary Agreements.  Around the same time, Landlords allege, Cartwright orally

20   informed Landlords that the Nondisturbance Agreements were a "minor issue" and "not to worry

21   about getting them if it was too much trouble."  The FAC concedes that "as a result of Cartwright's

22   statement, [Landlords] discontinued their efforts to obtain" the Nondisclosure Agreements.  FAC at

23   6.  Around November 14, 2008, Landlords allege, they received a letter from AMTC which stated

24   that Landlords "were in default of the terms of the lease and we have a right to terminate."

25   Landlords contend, however, that Cartwright again assured them orally "not to worry about it."

26   In early June 2009, according to the FAC, Cartwright stepped down as CEO of DDM and

27   AMTC and was replaced by defendant Waggener.  Very soon thereafter, on June 17 of that year,

28

Landlords allege they received a written notice that AMTC was terminating all eight leases because of Landlords' failure to furnish the Nondisturbance Agreements referenced in Paragraph 28 of the leases.  On June 25, 2009, according to the FAC, AMTC sent an email to its staff to notify them of what Landlords contend was a "new business model."  The email stated that "[o]ur intent is to step out of Alta Mira as the operating entity of the program by August 31st, and return operations to Ray Blatt, the former owner of the program and the current landlord. . . .  Alta Mira is far better suited to thrive as the unique, 'boutique' program it was always intended to be, and not operate within the larger context of [DDM]."  FAC at 9.

AMTC did, in fact, vacate the properties thereafter, and the FAC alleges that it left them "in poor condition, exceeding normal wear and tear, which [Landlords] estimate will cost in excess of $63,000 to repair."  *Id.* at 10.  Landlords claim they have attempted to mitigate their damages by re-renting the premises, but so far have been unable to do so.

Based on these events, Landlords filed suit in Marin County Superior Court, claiming AMTC breached the lease agreements by failing to pay rent and also by failing to surrender the properties in good condition.[3]  As noted above, the FAC also alleges that DDM, SP, SVP, and Waggener interfered with the leases and aided and abetted interference therewith.  Finally, it alleges Cartwright breached the guaranty he executed in conjunction with the leases.  Tenants removed the case to this Court on January 14, 2010 and moved to dismiss the FAC.  Cartwright, who is separately represented, joined in the notice of removal and in the motion to dismiss.  The parties presented oral argument on the motion on May 6, 2010.

## II.  LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim may be dismissed because of a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the

---

[3] Paragraph 18 of the Leases provides that "Lessee shall . . . upon an earlier termination of the rights of Lessee under this Lease, surrender and deliver the Premises into the possession and use of the Lessor without delay and in good order, condition, and repair, reasonable wear and tear excepted."

NO. C 10-00188 RS
ORDER

4

absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008).

In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 919 (9th Cir. 2008); *Vignolo v. Miller*, 120 F.3d 1075, 1077 (9th Cir. 1999). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1056-57 (9th Cir. 2008). Although they may provide the framework for a complaint, legal conclusions need not be accepted as true and "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50, 173 L.Ed.2d 868 (2009); *see also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Furthermore, courts will not assume that plaintiffs "can prove facts which [they] have] not alleged, or that the defendants have violated . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

### III.    DISCUSSION

A.    <u>Breach of Contract by AMTC</u>

    1.    <u>Failure to Pay Rent</u>

The leases in question provide that they "shall be governed, construed, and interpreted by, through, and under the Laws of the State of California," Lease Agreement, ¶ 37, and therefore the Court must look to California law in analyzing whether the FAC sufficiently alleges facts to support a claim of breach. A claim for breach of contract under California law consists of: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage resulting from the breach. *First Cmty. Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001). The dispute here centers around the second element—namely, performance by Landlords.

Defendants' first argument is that the FAC concedes Landlords themselves were the first ones to breach the leases. The FAC, in fact, does explain that Landlords "discontinued their efforts"

to obtain the Nondisturbance Agreements, but only after Cartwright orally informed them "not to worry about getting them if it was too much trouble." FAC at 6. The parties disagree as to whether such oral assurance constitutes a valid excuse for non-performance. This issue unquestionably tilts in favor of defendants. California courts routinely enforce contract clauses, such as the leases' "waiver of breach" paragraph, which require that modifications to a contract be in writing. *Marani v. Jackson*, 183 Cal. App. 3d 695, 704 (1986) ("A contract in writing may be subsequently modified by an oral agreement only if . . . the written contract does not contain an express provision requiring that modification be in writing."). This policy, moreover, is codified in the California Civil Code, which provides in pertinent part that "*[u]nless the contract otherwise expressly provides*, a contract in writing may be modified by an oral agreement." Cal. Civil Code § 1698(c) (emphasis added).

The Law Revision Commission's commentary to the 1976 Additions to § 1698 reinforce this notion: "The introductory clause of subdivision (c) recognizes that the parties may prevent enforcement of executory oral modifications by providing in the written contract that it may only be modified in writing." The commentary goes on to explain, however, that subsection (c) notwithstanding, "the principles described in subdivision (d) may be applied to permit oral modification *although the written contract expressly provides that modifications must be in writing*." (Emphasis added.) Subsection (d) provides: "Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts." The FAC, however, has not alleged that any of the conditions present in subsection (d) applies here. In the absence of such an allegation, in accordance with subsection (c) and the rule stated in *Marani*, Cartwright's oral assurances must be disregarded in the analysis of whether Landlords performed their own obligations under the leases.

As set forth above, Paragraphs 15 and 28 of the leases set forth procedures which the parties are to follow in the event of Landlords' default on a lease provision. Paragraph 15 sets forth such procedures generally, and Paragraph 28 sets forth what defendants contend is an alternate procedure in the event Landlords fail to furnish any necessary Nondisturbance Agreements. Under defendants'

interpretation, Paragraph 28's termination provisions afford much greater leeway to AMTC than the general termination provisions in Paragraph 15: Paragraph 15 describes a lengthy process involving written notification of default by AMTC, followed by a thirty day cure period with a mandatory extension of further time if Landlords exert reasonable efforts. Defendants contend Paragraph 28, on the other hand, gives rise to an immediate right to terminate upon Landlords' failure, within 60 days of the lease signing, to produce Nondisturbance Agreements.

Defendants' interpretation, which pits the two clauses of the contract against one another, is not, however, consistent with California principles of contract interpretation. The state Civil Code provides expressly that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civil Code § 1641. Accordingly, in determining the parties' respective rights and duties on the current facts, the Court must select a reasonable interpretation that allows for Paragraphs 15 and 28 to be harmonized, if indeed such an interpretation exists. Paragraph 28's discussion of AMTC's right of termination should therefore be understand as an implied reference to the general default provisions set forth under Paragraph 15. Any failure by Landlords to furnish the Nondisturbance Agreements, therefore, did not create an immediate right of termination on the part of AMTC, but rather triggered AMTC's requirement under Paragraph 15 to give written notice of default and wait at least 30 days for cure.

Even based on this favorable interpretation of the contract, however, the FAC fails to allege facts to support Landlords' performance. It alleges that AMTC gave written notice of Landlords' failure to comply with Paragraph 28 on November 14, 2008. FAC at 6. AMTC then awaited cure for over six months, but finally terminated the lease on June 17, 2009. FAC at 8. Landlords assert in their opposition brief that "the [failure to furnish] the Nondisturbance Agreement *was not* the reason for termination [by AMTC]." Opposition at 4. The FAC, however, specifically alleges that AMTC's notice of termination was made "on the basis of the failure of [Landlords] to provide the Subordination Agreements referenced in Paragraph 28 of the Leases." FAC at 8.

For these reasons, Landlords have thus far failed to state a valid claim for breach of contract based on failure to pay rent. The FAC, indeed, appears to concede that Landlords themselves failed

to perform their own contract obligations. Defendants' motion to dismiss this claim will therefore be granted with leave to amend.

### 2. Failure to Deliver the Properties in Good Condition

The FAC further claims that AMTC breached the contract by failing to surrender the premises in good condition in accordance with Paragraph 18 of the leases. This section of the FAC, however, takes up a mere five paragraphs and is quite cursory compared to the remainder of the complaint. As the Supreme Court explained in *Iqbal*, "[t]hreadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." 129 S. Ct. at 1949-50. The costs of repairing the damages allegedly caused by defendants is claimed to exceed $63,000, an amount that is far from insubstantial; yet specific facts to support this bald statement are lacking in the FAC as it currently stands. Accordingly, this claim for breach will also be dismissed with leave to amend.

### 3. Breach of Guaranty

With regard to the breach of guaranty claim against Cartwright, such a breach occurs when a debt falls due and remains unpaid. *Calif. First Bank v. Braden*, 216 Cal. App. 3d 672, 677 (1989). Here, absent a breach by defendants, no such unpaid debt arises. The breach of guaranty claim against Cartwright is therefore wholly dependent upon the viability of the FAC's breach of contract claims. As those claims have been dismissed with leave to amend, the same fate must befall the breach of guaranty claim.

## B. Intentional Interference with Contract and Aiding/Abetting Intentional Interference

The FAC also alleges that DDM, SP, SVP, and Waggener interfered with the leases between AMTC and Landlords by actively inducing AMTC to breach them, and that these parties also aided and abetted such interference. These additional claims presuppose, however, defendant's underlying breach of contract. The elements of a claim for intentional interference with contract are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) *actual breach or disruption of the contractual relationship*; and (5) resulting

damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, n.2 (1990) (emphasis added). When, as here, the complaint fails to allege an underlying breach, no claim for intentional interference can be stated. Moreover, aider and abettor liability requires actual commission of the underlying tort. *Richard B. LeVine, Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 (2005). Thus, the absence of a breach in the instant case also precludes liability on the aiding and abetting claim.

Further, if Landlords were to succeed in amending the FAC to allege the necessary breach, even then they would not be able to survive the pleading stage on the two intentional interference claims. California law has long recognized a cause of action against a defendant who intentionally induces a third person to breach his contract with another, but only if he does so without a privilege. *Herron v. State Farm Mutual Ins. Co.*, 56 Cal. 2d 202, 205 (1961); *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 35 (1941). This privilege exists whenever a person induces a breach of contract through lawful means in order to protect an interest that has a greater social value than the mere stability of the particular contract in question. *Imperial Ice*, 18 Cal. 2d at 35. The privilege is designed in part to protect the important interests served by the confidential relationship between a fiduciary and his principal. *See id.* at 38.

California courts have applied this so-called "manager's privilege" to cases in which a manager is accused of inducing his employer to breach an employment contract with another employee, *Marin v. Jacuzzi*, 224 Cal. App. 2d 549, 554 (1964); and to directors and attorneys employed by a corporation who were accused of inducing the corporation to breach a contract involving an equipment lease, *Olivet v. Frischling*, 104 Cal. App. 3d 831, 841 (1980), *disapproved on other grounds in Applied Equip. Corp. v. Litton Saudi Arabia, Ltd.*, 869 P.2d 454 (Cal 1994). In sum, the privilege applies anytime "[a] business advisor counsel[s] his principal to breach a contract that he reasonably believes to be harmful to his principal's best interests."

Moreover, the Ninth Circuit has held that the privilege applies even when "[the] advisor is motivated *in part* by a desire to benefit his principal." *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir. 1982) (emphasis added). By way of explanation, the Court commented: "The privilege is designed to further certain societal interests by fostering uninhibited advice by agents to

No. C 10-00188 RS
ORDER

9

their principals.  The goal of the privilege is promoted by protecting advice that is motivated, even in part, by a good faith intent to benefit the principal's interest." *Id.*  This rule "acknowledg[es] the practical reality that few business decisions are made with complete altruism." *Huynh v. Vu*, 111 Cal. App. 4th 1183, 1196 (2003) (interpreting the privilege in a slightly different way by holding that, when manager stands to reap a tangible personal benefit from principal's breach of contract—so that it is at least reasonably possible that the manager acted out of self-interest rather than in the interest of the principal—manager should not enjoy privilege unless trier of fact concludes that manager's *predominant* motive was to benefit principal).

Here, the FAC alleges that "DDM owned and controlled AMTC, maintained and audited AMTC financial statements, controlled AMTC's cash flow, and paid rent on the eight . . . leases." FAC at 2.  With regard to the other Tenants, it alleges that Sterling Partners and SVP, "by partnering with DDM and AMTC, controlled the business model and business plan for AMTC, invested over $22 million into the enterprise, assumed a controlling interest in DDM, and appointed [Waggener] . . . to [a] key position[ ] within DDM."  These allegations are undoubtedly sufficient to position DDM, Sterling Partners, SVP, and Waggener as the type of advisors and agents to whom the manager's privilege generally applies.  Moreover, as to the mental state behind the alleged interference, the FAC itself posits a mixed motive, claiming that these parties "made a business decision to terminate the Leases in order to serve a new business model and thereby induced AMTC to breach the Lease and sever its relationship with [Landlords] based on this new business model and their monetary influence as a result of the infusion of $22 million into DDM." FAC at 14.

Thus, the FAC's own averments proffer all of the elements of the manager's privilege, consistent with *Los Angeles Airways*'s mixed motive test.  This circumstance suggests that Landlords can allege no set of facts that would allow the two intentional interference claims to proceed.  Tenants' motion to dismiss will therefore be granted without leave to amend as to these two claims.

### IV.   CONCLUSION

For the reasons stated above, Tenants' motion to dismiss is hereby granted. The two breach of contract claims and the breach of guaranty claim are dismissed with leave to amend; the intentional interference with contract claim and the claim for aiding and abetting intentional interference with contract are dismissed without leave to amend. Should Landlords wish to amend their complaint to address the deficiencies described herein, they should do so within 30 days.

IT IS SO ORDERED.

Dated: 05/12/2010

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE